[No. E032415. Fourth Dist., Div. Two. Apr. 19, 2004.]

JAYLEE TITUS, a Minor, etc., Plaintiff and Appellant, v.
CANYON LAKE PROPERTY OWNERS ASSOCIATION, Defendant and
Respondent.

[No. E033517. Fourth Dist., Div. Two. Apr. 19, 2004.]

JAYLEE TITUS, a Minor, etc., Plaintiff and Appellant, v.
BARTON PROTECTIVE SERVICES, INC., Defendant and Respondent.

## COUNSEL

William James Koontz for Plaintiff and Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, Steven R. Parminter and Kathleen M. Bragg for Defendant and Respondent Canyon Lake Property Owners Association.

Bradley & Gmelich and Frederick B. Hayes for Defendant and Respondent Barton Protective Services, Inc.

OPINION

KING, J.—

## INTRODUCTION

James Hauser (Hauser) was a passenger in a car driven by Jack Incorvia (Incorvia) within the community of Canyon Lake. Incorvia, who was intoxicated, drove the car off a road into a tree, killing Hauser. Hauser's child brought an action against, among others, the Canyon Lake Property Owners Association (CLPOA) and Barton Protective Services, Inc. (Barton) for damages arising from Hauser's death. CLPOA and Barton separately demurred to plaintiff's second amended complaint, which the trial court sustained without leave to amend. Judgments were entered in favor of CLPOA and Barton. We affirm.

## FACTUAL ALLEGATIONS

Plaintiff's second amended complaint alleged five causes of action arising from the death of plaintiff's father. Only the fourth cause of action, titled "Premises Liability," was asserted against CLPOA and Barton.[1] This purported cause of action alleges the following facts: Property owners within the "privately owned and operated community" of Canyon Lake (Community) are "prime" members of CLPOA. CLPOA is a "mutual benefit nonprofit corporation" which owns, maintains, and operates the common areas and facilities, including streets, within the Community. Pursuant to its bylaws, CLPOA is "charged with 'doing whatever is necessary, conducive, incidental or advisable to accomplish and promote its object and purposes.'" Its "object" is to "further and promote the common interest and welfare of its members." Among its purposes is to "preserve, protect and police" the common facilities.

CLPOA is governed by, and derives its authority from, certain covenants, conditions, and restrictions (CC&R's). Pursuant to the CC&R's, CLPOA may levy fines, set speed limits, enforce curfews on minors, make arrests, detain individuals, and limit, curtail, or prohibit conduct that violates the CC&R's or CLPOA's rules and regulations. It may also exclude non-prime members from the Community. Any violation of the CC&R's is deemed to constitute a nuisance against which "every remedy allowable by law or equity" is available.

---

[1] The second amended complaint also alleges causes of action labeled "Survivorship" and "Vehicular Negligence" against Incorvia, "Negligent Entrustment" against Incorvia's father, and "Unlawful Sale of Alcohol" against unknown Doe defendants.

CLPOA hired Barton, a private security company, to maintain the Community in a safe and secure condition for the residents and visitors of the Community, and to enforce CLPOA's rules and regulations "to the exclusion of any public security force." Barton was "charged with . . . enforcing upon residents and visitors alike the rules and regulations of the 'Community.' "

The second amended complaint further alleged that for years, the Community had a high incidence of alcohol and drug use by minors within private homes and in common areas. Such use led to numerous incidents of driving under the influence of alcohol, speeding, reckless driving, erratic driving, and other behavior contrary to the interest and welfare of the Community's members.

Incorvia lived in the Community with his father, a property owner and "prime" member of CLPOA. Barton had previously ticketed Incorvia for speeding, evading arrest, and "running stops" on several occasions. He had also been arrested or convicted of possession of controlled substances, public drunkenness, trespassing, being under the influence of controlled substances, furnishing methamphetamine to minors, and reckless and erratic driving.[2] As a result of such conduct, CLPOA and Barton had notice that Incorvia and minors within the Community were consistently violating the CC&R's and CLPOA's rules and regulations. Nevertheless, CLPOA and Barton "did nothing to curtail or prevent" such conduct.

On January 27, 2001, Incorvia "attended a series of gatherings in private homes and elsewhere" where he consumed illegal drugs and alcohol. Intoxicated, he drove his car at a high rate of speed, recklessly and carelessly, in violation of CLPOA rules and regulations and California law. Hauser was a passenger in the car. Incorvia drove off a road within the Community and into a tree, killing Hauser.

## PROCEDURAL BACKGROUND

CLPOA and Barton separately filed demurrers to the fourth cause of action. CLPOA's demurrer was based upon the grounds that (1) the fourth cause of action did not allege facts supporting a duty to Hauser or that any duty was breached, and (2) it is immune from liability pursuant to Civil Code section 1714, subdivision (c). Barton's demurrer was based on similar grounds and added a third—that it did not own, control, or possess the property on which the incident occurred.

At the hearing on the demurrers to the second amended complaint, the court stated that the second amended complaint failed to allege "any facts

---

[2] It is unclear from the second amended complaint whether CLPOA or Barton had actual knowledge of these arrests and convictions. In her opening brief, plaintiff asserts that these defendants were aware of such arrests.

showing that Barton or the homeowners association had any knowledge of the party on the night of the accident, or intoxication on the night of the accident, that they had the ability to stop this man from driving, that they had a duty to do so." The court concluded that it did "not see a duty" and sustained the demurrers without leave to amend. Following the entry of judgments in favor of CLPOA and Barton, plaintiff appealed.

## DISCUSSION

When reviewing a judgment following the sustaining of a demurrer, we assume the truth of the complaint's properly pleaded or implied factual allegations. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) However, contentions, deductions, and conclusions of fact or law in the pleading are not considered. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Plaintiff contends CLPOA and Barton had a duty to affirmatively act to protect Hauser from the risks created by allowing Incorvia to drive within the Community. For CLPOA, this duty required it to "eject" Incorvia from the Community. Barton, plaintiff argues, was required to detain and arrest Incorvia prior to the accident. Plaintiff concedes that these duties would constitute exceptions to the general rule that a defendant will not be held liable for the failure to control the conduct of third parties. (See, e.g., *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].) Plaintiff argues, however, that CLPOA and Barton had a "special relationship" with Incorvia and the residents of the Community giving rise to the proposed duties.

"Resolution of the issue whether a special relationship exists giving rise to a duty to protect (or warn) comprehends consideration of the same factors underlying any duty of care analysis." (*Hansra v. Superior Court* (1992) 7 Cal.App.4th 630, 646 [9 Cal.Rptr.2d 216].) Such factors include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*); see *Davidson v. City of Westminster, supra,* 32 Cal.3d at p. 203 [analyzing the question of special relationship according to *Rowland* factors].)

The *Rowland* court's list of factors and policy considerations is not exhaustive. In cases where the alleged duty requires taking action to

protect someone from the conduct of others, courts have also considered factors involving the relationship between the parties and the connection between the defendant and the injury-producing event. These include whether the defendant induced the victim's reliance on a promise that defendant would protect or warn the victim (see *Morgan v. County of Yuba* (1964) 230 Cal.App.2d 938, 944–945 [41 Cal.Rptr. 508]), the extent to which a defendant created the peril or increased the risk of harm to potential victims (see *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 863 [84 Cal.Rptr.2d 157]), and the existence of a dependency relationship between the plaintiff and defendant (see *Ronald S. v. County of San Diego* (1993) 16 Cal.App.4th 887, 895 [20 Cal.Rptr.2d 418]). When the balance of all relevant factors weigh in favor of imposing a duty to protect someone from the conduct of others, a "special relationship" is said to exist. (*Hansra v. Superior Court, supra,* 7 Cal.App.4th at p. 646.) "Special relationship" is thus "simply a label expressing the conclusion that the facts, considered in light of the pertinent legal considerations, support the existence of a duty of care." (*Ibid.*; see also *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334] ["legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done"].)

Here, the relationship between these defendants and Incorvia and Hauser, and their connection to the injury-producing event, are minimal. CLPOA is a homeowners association with authority to make traffic laws and exclude nonprime members from the Community. Barton was engaged to enforce the Community's rules and regulations. Incorvia, a nonprime member of the Community, resided in the Community with his father, a property owner. Although the second amended complaint does not allege that Hauser was a resident of the Community, plaintiff asserts she can amend her pleading to so allege. While these facts present some connection between the defendants and the individuals involved in the accident, the relationship is remote. At best, all that is or can be alleged is that both individuals reside in the Community. There is no contractual relationship between them and the homeowners association. No promise was made to either Incorvia or Hauser upon which they relied. Neither CLPOA nor Barton created the peril—Incorvia's driving while intoxicated—nor did they act to increase the already existing risk of harm to which Hauser exposed himself. They did not provide Incorvia with either the car or the alcohol, and they did not cause Hauser to become a passenger in Incorvia's car. Nothing in the pleading suggests that these defendants engaged in any conduct from which a dependency relationship arose. Although plaintiff alleges that the CC&R's create affirmative obligations to provide for security within the Community, such obligations do not, without more, create a "special relationship" requiring defendants to affirmatively act to protect Community residents from Incorvia.

The balance of other relevant factors further weigh against the imposition of a duty on CLPOA to eject Incorvia or Barton to arrest him. As to the foreseeability of injury, Incorvia's conduct prior to the accident did not present a "high degree of foreseeability" of harm to Community residents. (See *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 679 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 407 [1 Cal.Rptr.3d 762] (*Sakiyama*).) The second amended complaint alleges that CLPOA knew that Incorvia was a user of illegal drugs and alcohol, that he had engaged in "public drunkenness," and that he was a reckless and erratic driver who exceeded speed limits and ran through stop signs. The pleading, however, does not allege any prior accidents involving Incorvia, that he had ever caused injuries to anyone, or that he had ever been stopped or arrested for driving while intoxicated. Thus, while it was foreseeable that Incorvia could become intoxicated, drive a car, and cause an accident, " 'almost any result was foreseeable with the benefit of hindsight.' " (*Sakiyama, supra,* at p. 407, quoting *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 269 [80 Cal.Rptr.2d 196].) The foreseeability factor does not favor imposing the proposed duties.

■ In evaluating the degree of certainty of injury factor, courts consider the closeness of the connection between the defendant's actions and the plaintiff's injuries. (See, e.g., *Sakiyama, supra,* 110 Cal.App.4th at p. 409.) In *Sakiyama*, the owner of property on which a "rave" party was held was sued when intoxicated attendees were injured in an auto accident after leaving the party. In holding that the property owner did not owe the attendees a duty of care, the court stated: "Although appellants undeniably were injured, their injuries were not closely connected to [the property owner's] conduct in renting its facility for a rave party. . . . While the sale and consumption of drugs may have occurred at the party, there is no evidence that [the property owner] encouraged or participated in drug use or required the attendees to stay at the party." (*Ibid.*, fn. omitted.) As in *Sakiyama*, there is no allegation that CLPOA or Barton encouraged or had any involvement in Incorvia's intoxication. Indeed, as set forth above, any connection between defendants and the injury-producing event is tenuous at best.

The burden on CLPOA of ejecting Incorvia and the consequences to the Community of such a burden weigh heavily against imposing such a duty. Plaintiff argues that CLPOA's duty to eject Incorvia is similar to the duty a landlord has to evict a violent tenant. For this proposition, she relies on *Madhani v. Cooper* (2003) 106 Cal.App.4th 412 [130 Cal.Rptr.2d 778] (*Madhani*). In *Madhani*, the plaintiff and her mother lived in an apartment building owned by the defendants. For several months, plaintiff and her mother were accosted and assaulted by another tenant. Plaintiff complained at least six times to the building managers, who did nothing to protect them. The abusive tenant eventually pulled the plaintiff out of her apartment by her

hair, hit her, and threw her down the stairs. (*Id.* at pp. 413–415.) The owners knew that the aggressive tenant "had engaged in repeated acts of assault and battery against Madhani as well as her mother." (*Id.* at p. 415.) It was thus clearly foreseeable that the tenant's violent outbursts and physical assaults would result in serious injury to the plaintiff. (*Id.* at pp. 415–416.) Weighing such clear foreseeability against other policy considerations, the court suggested that the scope of the owners' duty to take reasonable steps to protect the plaintiff included evicting the tenant. (*Ibid.*)

*Madhani* is distinguishable. First, the owners' duty to evict the tenant in *Madhani* was based primarily upon the high degree of foreseeability of harm to the plaintiff from the aggressive tenant. "It is difficult to imagine a case," the court stated, "in which the foreseeability of harm could be more clear." (*Madhani, supra,* 106 Cal.App.4th at p. 415.) Unlike the months of verbal and physical assaults, threats, and intimidation against the plaintiff by the tenant in *Madhani*, there are no allegations here that Incorvia had previously harmed, assaulted, or threatened anyone. Although his drug and alcohol use and reckless driving satisfy the "low threshold for foreseeability" in our analysis of duty, the risk of harm was significantly less certain than the "clear" foreseeability of harm present in *Madhani*.

Even assuming CLPOA could "eject" a resident from the Community or bar him from using its streets, such a remedy would be substantially more burdensome than evicting a tenant from an apartment building. Eviction, or an unlawful detainer action, is a "summary proceeding" for which California law provides expedited judicial procedures. (See generally Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2003) ¶ 7.75, p. 7-16; Code Civ. Proc., §§ 1159–1179a.) Time periods for pleading are shorter than ordinary civil actions, the matter is set for trial more quickly and entitled to priority on the trial calendar, and expeditious enforcement procedures are available. (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 685, pp. 872–873.) In contrast to the relatively quick and inexpensive proceedings for evicting tenants, California law does not provide any summary remedy for ejectment. (See Friedman, *supra,* ¶ 7:84 at p. 7-19.) At a minimum, litigation and a court order would be required before CLPOA could preclude a resident from gaining access to his residence. (See Civ. Code, § 1361.5.)[3] Thus, regardless of the additional legal and factual issues

---

[3] Civil Code section 1361.5 provides: "Except as otherwise provided in law, an order of the court, or an order pursuant to a final and binding arbitration decision, an association may not deny an owner or occupant physical access to his or her separate interest, either by restricting access through the common areas to the owner's separate interest, or by restricting access solely to the owner's separate interest." Although the second amended complaint alleges that Incorvia's father, not Incorvia, is a property owner within the Community, Incorvia allegedly lives with his father and would be an "occupant" entitled to access under this section.

posed by an effort to "eject" a resident of a private community,[4] it is clear that pursuing such a remedy would involve substantially more time and expense than the mere eviction of a tenant.

The imposition of a duty to eject Incorvia would also have, at a minimum, undesirable consequences for the Community. CLPOA contends that an action to eject Incorvia would violate his constitutional rights to live with his family members under *Moore v. East Cleveland* (1977) 431 U.S. 494 [52 L.Ed.2d 531, 97 S.Ct. 1932]. We need not, however, determine the constitutionality of an ejectment action by CLPOA. It is enough to note that even if an ejectment action were permissible and successful, it would result in the court-ordered separation of family members, which, even if constitutional, would not be favorable as a matter of public policy.

The "moral blame" factor does not weigh in favor of imposing liability on CLPOA or Barton. "To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability. [Citation.] Instead, courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts [citation]." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 270 [80 Cal.Rptr.2d 196].) The alleged conduct of CLPOA and Barton does not involve such culpability.

Nor does the policy of preventing future harm weigh in favor of imposing a duty to eject Incorvia. Ejecting Incorvia, assuming it could be accomplished both legally and practically, would simply preclude him from driving within the borders of the Community. There is no reason to believe that ejectment

---

[4] Incorvia's ejectment, plaintiff suggests, could have been achieved by having his conduct declared a nuisance pursuant to the CC&R's. Plaintiff has provided us with no authority supporting her assertion that Incorvia or his alleged conduct could be declared a nuisance or that CLPOA had a right to the proposed remedy. Indeed, if Incorvia's conduct was a nuisance, it would appear to be a public nuisance for which private remedies are generally not available. (Civ. Code, §§ 3480, 3491, 3493, 3494; see generally 11 Witkin, Summary of Cal. Law, *supra*, Equity, § 124, pp. 805–806 & § 144, pp. 824–825.) Even if the conduct constituted a private nuisance against which CLPOA could seek relief, CLPOA would have had a heavy burden of proof to establish such a nuisance. Where, as here, the alleged nuisance would be based upon a potential or possibility of future injury, there must be a "reasonable certainty" of injury and a plaintiff "must demonstrate an actual and unnecessary hazard." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1213 [52 Cal.Rptr.2d 518].) While the merits of a possible nuisance or ejectment action are not before us, we note that such an action, if permitted at all, would likely involve far more complex legal and factual issues than would an unlawful detainer action by a landlord against a tenant.

from the Community would prevent him from driving intoxicated or injuring people in other communities. Ejecting him from the Community would appear to be particularly ineffective as to protecting his own passengers, such as Hauser, who would likely be riding with Incorvia outside the Community.

■ Although arresting Incorvia just prior to the accident would certainly have prevented Hauser's death, there are no facts alleged showing that Barton's officers knew Incorvia was driving intoxicated. Even if they did, it is well settled that police officers have no duty to detain or prevent people from driving even when they knew or should have known the drivers were intoxicated. (See *City of Sunnyvale v. Superior Court* (1988) 203 Cal.App.3d 839, 841–842 [250 Cal.Rptr. 214]; *Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 288, 295 [217 Cal.Rptr. 450]; *Jackson v. Clements* (1983) 146 Cal.App.3d 983, 985–986, 988 [194 Cal.Rptr. 553].) Plaintiff contends these cases are inapposite because Barton and CLPOA, unlike police departments, had contractual obligations beyond those the police owe to members of the public. Even so, Barton's alleged contractual duties did not include detaining or arresting intoxicated drivers. Although the CC&R's allegedly give CLPOA and, by contract, Barton, the *"authority"* to "make arrests [and] detain individuals" for violating the CC&R's or CLPOA's rules and regulations, this does not create an *affirmative obligation* to do so whenever they suspect someone is violating, or may violate, a Community rule. (Cf. *Knighten v. Sam's Parking Valet* (1988) 206 Cal.App.3d 69, 76 [253 Cal.Rptr. 365].) Nor do the vaguely stated responsibilities of maintaining the Community in a safe and secure environment and to preserve, protect, and police the commonly owned facilities give rise to such an obligation. Indeed, the reference to policing the facilities suggests duties similar to, and coextensive with, those of a public police force.

■ Balancing the relevant factors, we conclude that the low level of foreseeability of injury, and the minimal connection between these defendants and the individuals involved in the injury-producing event, is outweighed by defendants' lack of connection to the injury-producing event, the burden of complying with the proposed duties, and the other pertinent considerations. Accordingly, we conclude that the second amended complaint fails to allege facts creating a duty on the part of either CLPOA or Barton to act to prevent Incorvia from driving intoxicated within the Community.

Plaintiff relies on *Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193 [208 Cal.Rptr. 384] (*Marois*). In *Marois*, the Court of Appeal held that security guards hired to protect the customers of a Jack-In-The-Box restaurant had a "special relationship" with the customers and could be liable for failing to protect a customer from an assault. *Marois* is distinguishable in at least two respects. First, the defendant security guards did not dispute that

a "special relationship" existed between the restaurant business and its customers. (*Marois, supra,* at p. 199.) Therefore, the Court of Appeal did not analyze the factors and policy considerations to determine whether a duty to take affirmative action existed. Here, by contrast, the parties dispute the existence of a special relationship. Indeed, as explained above, we conclude that the allegations do not support the existence of a special relationship sufficient to justify the imposition of duties to eject or arrest Incorvia. The rule applied in *Marois* is thus inapplicable here.

Second, *Marois* is distinguishable on its facts. The security guards in *Marois* observed the assailant fighting with one customer and vandalizing a kiosk in the parking lot of the restaurant before attacking the plaintiff with a baseball bat. Significantly, the court held that, as a matter of law, the security guards could not be liable for failing to restrain the assailant until the apparent risk of physical injury became "immediate." (*Marois, supra,* 162 Cal.App.3d at pp. 200–201.) They could not be held liable, therefore, for allowing the assailant to initially remain on the premises or for failing to restrain him while he vandalized the kiosk. When, however, "an individual is being physically assaulted, or where another individual is approached by a bat-wielding assailant," the court explained, there is a "clearly foreseeable risk" to which the security guards should respond. (*Id.* at p. 202.) In contrast to the circumstances in *Marois*, Barton's security guards were, at most, aware that Incorvia was driving while intoxicated. While Incorvia's condition presented some foreseeable risk of injury, as explained above, it did not create a risk of immediate physical harm comparable to the bat-wielding assailant in *Marois*.

■ Plaintiff argues that she should be given leave to amend additional facts. Generally, it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) It is the plaintiff's burden to show either the trial court or the reviewing court how the complaint can be amended to state a cause of action. (*Ibid.*) "Leave to amend is properly denied if the facts and nature of plaintiff's claim are clear and under the substantive law, no liability exists [citation] or where it is probable from the nature of the defects and previous unsuccessful attempts to plead that the plaintiffs cannot state a cause of action [citation]." (*Haskins v. San Diego County Dept. of Public Welfare* (1980) 100 Cal.App.3d 961, 965 [161 Cal.Rptr. 385].) Here, plaintiff states that she can further allege that Barton's security guards saw Incorvia driving his car recklessly "while under the influence from party to party" on the night of the accident, and that a Barton gate guard knew that Incorvia was "driving under the influence" but nevertheless allowed Incorvia to "pass through a guarded checkpoint shortly before the accident." Even if we assume these facts are true, such facts would not support a duty to eject or arrest Incorvia

based upon the analysis set forth above. (*Jackson v. Clements, supra,* 146 Cal.App.3d 983.) In any event, plaintiff has already filed an original complaint and two amended complaints without including these allegations. She has thus had a "fair opportunity to correct any defect." (See *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1227 [44 Cal.Rptr.2d 197].) Accordingly, leave to amend was properly denied.

## DISPOSITION

The judgments in favor of CLPOA and Barton are affirmed. CLPOA and Barton are awarded their costs on appeal.

McKinster, Acting P. J., and Gaut, J., concurred.