[No. G036448. Fourth Dist., Div. Three. June 13, 2007.]

LEROY BARBER, Plaintiff and Appellant, v.
WILLIAM WU-YE CHANG, Defendant and Respondent.

## Counsel

Emling Forensis and Michael J. Emling for Plaintiff and Appellant.

Law Offices of Richard J. Wianecki, Paul W. Rosenfield and Dana C. Clark for Defendant and Respondent.

## Opinion

**ARONSON, J.**—Leroy Barber appeals from the trial court's entry of summary judgment on his negligence claim against William Wu-Ye Chang, the owner of a small apartment complex where a tenant shot Barber. Barber contends Chang had a duty to adopt measures to reduce the risk of harm posed by a potentially violent tenant, and claims triable issues of fact exist on whether Chang responded reasonably to written notice the tenant had recently brandished a shotgun at another visitor and tenant. We conclude Chang failed to carry his initial burden on summary judgment to show he owed no duty to undertake minimally burdensome measures to alleviate the risk posed by a violent tenant. Accordingly, we reverse the judgment.

I

### FACTUAL AND PROCEDURAL BACKGROUND

Barber and his longtime companion, Chanda King, moved into one of the four units in Chang's apartment complex in 1995. The couple had two young children, and Chanda's 6-year-old son, Christopher, also lived with them. That same year, Carol Gray and her son, Daniel, moved into another unit in the complex. Daniel was about 12 years old at the time. Chanda's mother, Jean King, moved into her own unit in Chang's complex in 1996. Jean described Daniel Gray as "an odd kid." Over the years Daniel periodically argued with other tenants concerning such things as pet droppings left on the common lawn. He often took pictures of people visiting the apartments or of tenants engaging in activities that annoyed him.

Barber and Chanda moved out in May 2002. They later claimed Daniel's harassment had escalated into a physical confrontation between Barber and Daniel over whose dogs had defecated on the lawn. Barber called the Anaheim police concerning the incident, but he did not report the matter to Chang. According to Chang, Barber and Chanda were behind in their rent when they moved out, and they left the apartment "in very bad shape." Daniel offered to clean the apartment and perform other handyman services

for Chang in exchange for credit towards rent. When Chang agreed, Daniel and his girlfriend moved into the apartment.

Chanda returned to the complex often because her son Christopher generally resided there with Jean, so he could stay enrolled at the local high school. According to Chang, between "May of 2002 and March of 2004, Leroy Barber had only been back to the apartments on a few occasions. At no time during those few visits did Daniel Gray ever confront Leroy Barber."

By April 2004, Daniel had reached adulthood and still lived in Chang's complex. On April 4, 2004, Chanda dropped Christopher off at her mother's and, as she prepared to leave in her van, Daniel circled the vehicle, snapping photographs. He remained silent at first, but bumped Chanda two or three times as she made her way to the driver's seat. He then exclaimed, "Leave me alone," "Bring Leroy over here and I'll take care of him," "Bring Leroy here. Bring him here" and "Don't bother me." Jean witnessed the incident and saw Daniel run up to his apartment as Chanda settled into the van. Daniel emerged from his apartment with a shotgun, ran toward Chanda's van, and aimed the gun at her vehicle as she departed down the alley. Daniel said nothing and did not pull the trigger, but simply turned and trained the shotgun on Jean as he climbed the stairs back to his apartment.

Terrified, Jean retreated to her unit. The next day, she sent a certified letter to Chang's son, Wei Chang, who managed the fourplex. The letter stated: "Last night I had an incident with Daniel that has me scared to death. At about 8[:]15 PM Chanda came over to bring Chris home, [and] when she got out of the van Daniel came to his window and started yelling at us 'leave my family alone[.]' Chanda came into the house and stayed about 30 minutes[;] when she left she was putting the puppy in the van, [and Daniel] came running down the stairs and ran around the van 3 or 4 times screaming 'leave my family alone[.]' Chanda asked him what was the matter [but] he just screamed[;] then she got into the van to leave, [and] he ran upstairs and came right back down with a shotgun, ran out to the back of the garages and pointed the gun at the van as it went around the corner. He then came back towards the front pointing the gun at me and again yelling 'Leave my family alone[.]' "

Jean's letter continued: "I have done nothing to him[;] as a matter of fact I have gone out of my way to stay away from him. I realize that he has bad feelings about Leroy, but to take that out on my . . . daughter and my grandson is inexcusable. He has constantly harassed Chris, to the point he is afraid to even be out when Daniel is around. [¶] I did not call the police, because I don't want any more trouble but truthfully I am afraid for my life. [¶] . . . [¶] I hope that you can do something about this problem so that I will

again feel safe in my home. [¶] Please call me so that we can discuss this matter. [¶] . . . [¶] The [s]ecurity guard here [at her workplace] has advised me that I should have called the police, as it is a felony to aim a gun at anyone. But as I said before I really don't want any more trouble. [¶] Please help me with this matter."

Chang telephoned Jean when he received the letter. He advised her he could not "take action as a landlord" unless she filed a police report or obtained a restraining order against Daniel. He also suggested she speak with Daniel's mother about the incident.

About three weeks later, on April 28, 2004, Barber visited the complex to retrieve a tool from Jean's garage. Neither Chanda nor her mother had told him about the April 4th incident with Daniel. As Barber rummaged about for the tool, he heard footsteps in the alley. Turning, he spotted Daniel. According to Barber, Daniel's eyes were "very bulgy and big," and Daniel stared at him "with no words exchanged whatsoever." Then Barber "heard Daniel up in his apartment, which was up above the garages." After "a bunch of booming and banging, . . . like he was throwing chairs around," Daniel reappeared, "flying around the corner [with a] 12-gauge pump in his hand."

Barber did not know Daniel had called 911. According to Barber, he later learned Daniel "had told Anaheim PD that he was armed with a shotgun . . . and that he was going to come down and interrogate me and shoot me, which is exactly what he did." Daniel accused Barber of stalking his family, felled Barber with a shotgun blast to the leg, kicked out one of Barber's teeth, stomped his wounded leg, and then placed the gun in Barber's "rectal area." Barber jumped, and Daniel pulled the trigger, inflicting another wound to Barber's leg. The police arrived and, after a standoff in which Daniel held the shotgun to Barber's temple, Daniel finally surrendered the gun and the police subdued him.

Barber filed a complaint alleging a cause of action for negligence. The complaint generally alleged Chang owed Barber "a duty of reasonable care" and "a duty to take reasonable action to protect plaintiff from harm." The complaint also alleged Chang breached his duty of care by "failing to take reasonable steps to provide security for Plaintiff from known threats and conditions present at the rented premises."

At his deposition in this matter, Wei Chang described his telephone conversation with Jean after he received her letter: "What I said was you have to call the police, you have to file a police report. And you need to file a restraining order because these are things that I, as a landlord or manager, cannot act upon until I have documentation that's a little more forceful than

what one tenant says of another." According to Chang, he treated Jean's letter as "a serious matter," acknowledging, "I think that this is a threat, if it is true." Chang later stated in his deposition that he "believed" Jean's account of the April 4th incident. But in the declaration he subsequently filed in his summary judgment motion, he repeatedly referred to Daniel's history as a "good tenant" and to Jean "reporting an incident that was *supposed to have* occurred April 4, 2004, wherein Daniel [G]ray brandished a shotgun." (Italics added.) Chang stressed in his declaration he "had never received any complaints about Daniel Gray having to do with any kind of violence whatsoever."

Chang moved for summary judgment solely on the ground he owed Barber no duty of care. Chang's separate statement focused only on whether he had a duty to hire security guards to prevent Daniel from harming visitors to the complex. Chang claimed "there was no reasonable security measure that should have been in place" and "[i]t is unreasonable for a landlord to be expected to hire a security guard to protect a non-resident who may have a confrontation with a tenant when the non-resident decides to visit the premises at an unknown date and time . . . ." Chang supported these claims with a declaration from his expert witness, who concluded "[t]his incident was not foreseeable based on previous crimes that have occurred on the premises. There is no history of prior similar incidents, shootings or crimes of violence at this location."

In his opposition, Barber contended triable issues of fact precluded summary judgment and repeated the claim in his complaint that Chang "so negligently managed the premises that plaintiff was exposed to unreasonable risk of harm." In support, Barber presented a declaration from his expert, who opined Chang should have reported Daniel's felonious assault on Jean and Chanda to the police and hired security guards to protect tenants and invitees. The trial court granted Chang's motion, and Barber now appeals.

## II

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Wiener*).) In performing our de novo review, we employ a three-step analysis. "First, we identify the issues raised by the pleadings. Second, we determine whether the movant established entitlement to summary judgment, that is, whether the movant showed the opponent could not prevail on any theory raised by the pleadings. Third, *if the movant has met its burden*, we consider whether the opposition raised triable issues of fact."

(*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 939–940 [51 Cal.Rptr.3d 1]; see also *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–855, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].) To shift the burden, the defendant must conclusively negate a necessary element of the plaintiff's case or demonstrate there is no triable issue of material fact requiring a trial. (*Hawkins, supra*, 144 Cal.App.4th at p. 940.) If the evidence does not support judgment in the defendant's favor, we must reverse summary judgment without considering the plaintiff's opposing evidence. (*Ibid.*) Any evidence we evaluate is viewed in the light most favorable to the plaintiff as the losing party; we strictly scrutinize the defendant's evidence and resolve any evidentiary doubts or ambiguities in the plaintiff's favor. (*Wiener, supra*, 32 Cal.4th at p. 1142.)

### III

### DISCUSSION

#### A. *Landowner Liability for Third Party Criminal Assaults*

Before turning to the specific issues raised in Barber's appeal, we briefly summarize the applicable legal principles used in determining when a landowner owes a duty to alleviate the risk of a third party criminal assault on tenants and invitees.

█ The elements of negligence are established when it is shown "that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*).) " '[E]very [negligence] case is governed by the rule of general application that all persons are required to use ordinary care to prevent others from being injured as the result of their conduct.' [Citation.] The existence of a legal duty to use reasonable care in a particular factual situation is a question of law for the court to decide. [Citation.] However, the elements of breach of that duty and causation are ordinarily questions of fact for the jury's determination. [Citation.]" (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278 [12 Cal.Rptr.3d 846] (*Vasquez*).)

█ In *Ann M.*, the California Supreme Court applied these principles in describing the general duty of landowners: "It is now well established that California law requires landowners to maintain land in their possession and control in a reasonably safe condition" and, "[i]n the case of a landlord, this general duty of maintenance, which is owed to tenants and patrons, has been held to include the duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the

absence of such precautionary measures." (*Ann M., supra,* 6 Cal.4th at p. 674.) But "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated." (*Id.* at p. 676.) For example, a condominium owners association is potentially liable for injuries caused by third party criminal conduct where the association was aware of past similar crimes occurring on the property and of circumstances making a similar occurrence likely. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 501–503 [229 Cal.Rptr. 456, 723 P.2d 573]; see also *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 807 [205 Cal.Rptr. 842, 685 P.2d 1193] [landowner potentially liable "in circumstances where the possessor has reasonable cause to anticipate the misconduct of third persons"].)

Thus, when the third party crime is committed by a tenant, foreseeability turns on whether the landlord had "notice of [the tenant's] propensity for violence." (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 596 [22 Cal.Rptr.3d 832]; accord, *Madhani v. Cooper* (2003) 106 Cal.App.4th 412, 416 [130 Cal.Rptr.2d 778] (*Madhani*) [citing tenant's "known proclivity for making verbal and physical assaults"]; *Davis v. Gomez* (1989) 207 Cal.App.3d 1401, 1406 [255 Cal.Rptr. 743] [question was whether tenant "had shown . . . dangerous tendencies"; summary judgment proper where review disclosed "no evidence whatsoever of the 'brandishing and exhibiting' to which appellants refer"]; *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 308 [34 Cal.Rptr.2d 498] ["no evidence" suggested the "tenant ha[d] violent propensities or handle[d] firearms unsafely while drinking"]; see also *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 245 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*) [prior "similar" incidents required, not prior "identical" ones].)

Foreseeability is a "crucial factor" in determining not only the existence of the landowner's legal duty, but its "scope."[1] (*Ann M., supra,* 6 Cal.4th at pp. 676, 678.) In *Ann M.,* the court explained "the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." ' " (*Id.* at pp. 678–679.)

---

[1] Other factors also bear on the existence and scope of a legal duty, such as: " '[T]he degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ann M., supra,* 6 Cal.4th at p. 675, fn. 5.)

Applying the heightened foreseeability standard, the court in *Ann M.* concluded the scope of the defendant landowner's duty in that case "did not include providing security guards in the common areas." *(Id.* at p. 674.) Because hiring security guards imposes significant financial and social costs, and because providing patrols "adequate to deter criminal conduct is not well defined," a "high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards." *(Id.* at p. 679.)

Where guards are not required, a landowner's duty may nevertheless include less burdensome steps to alleviate the risk of harm posed to tenants and invitees. As the Supreme Court explained in *Delgado*, "[T]he absence of heightened foreseeability in this case merely signifies that defendant owed no special-relationship-based duty to provide guards or undertake other similarly burdensome preventative measures; it does not signify that defendant owed no *other* special-relationship-based duty to plaintiff . . . ." (*Delgado, supra*, 36 Cal.4th at p. 245.) For example, a restaurant or bar proprietor has a duty to warn patrons of known dangers and to protect patrons from injury inflicted by other guests. (*Id.* at p. 241 [preventive measures may include telephoning the police for assistance].)

██ "When the balance of all relevant factors weigh in favor of imposing a duty to protect someone from the conduct of others, a 'special relationship' is said to exist." (*Titus v. Canyon Lake Property Owners Assn.* (2004) 118 Cal.App.4th 906, 912 [13 Cal.Rptr.3d 807].) " 'Special relationship' is thus 'simply a label expressing the conclusion that the facts, considered in light of the pertinent legal considerations, support the existence of a duty of care.' " (*Ibid.*; see also *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334] ["legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done"].) As noted, a landlord's general duty of maintenance includes the duty to take reasonable steps to secure the common areas against third party criminal acts—*where these acts are foreseeable.* (*Ann M., supra*, 6 Cal.4th at p. 674.) With these principles in mind, we turn to the issues raised in this appeal.

B. *Chang Failed to Meet His Initial Burden to Show He Owed No Duty of Care*

Chang contends he owed no duty of care to Barber because Daniel's assault was not foreseeable. He argues the brandishing incident did not provide "notice" Daniel posed a risk of harm, and a duty would arise only if Chang had learned there was "evidence of prior potentially violent incidents involving [Daniel] discharging a weapon." Chang also argues his duties as a

landlord did not extend to Barber because it was unforeseeable Barber would visit the property. Finally, Chang asserts no facts support a finding of heightened foreseeability and therefore he owed no duty to prevent any potential harm by hiring security guards. We address these issues in the order raised.

Barber's complaint alleged Chang owed "a duty to take reasonable action to protect [Barber] from harm." Chang argues no duty arose as a matter of law because there is no evidence Daniel had discharged the weapon in an earlier incident. In other words, Chang contends the law requires a showing Daniel had committed a nearly identical prior crime to the one inflicted on Barber before Chang had a duty to act. Chang is mistaken. To establish heightened foreseeability, the law requires "prior *similar* criminal incidents (or other indications of a reasonably foreseeable risk of violent criminal assaults in that location) and does not require a showing of prior *nearly identical* criminal incidents." (*Delgado, supra,* 36 Cal.4th at p. 245.) For example, a bank robbery does not put a landlord on notice to guard against sexual assault on the property, but prior crimes of theft and vandalism may make the crime of robbery a foreseeable occurrence. (See *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1197–1198 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*).) Notably, the foreseeability question here does not involve the prospect of "endemic" (*Ann M., supra,* 6 Cal.4th at p. 678) violence generally or a universe of "unknown assailants" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 766 [107 Cal.Rptr.2d 617, 23 P.3d 1143]), but rather a particular tenant identified as a threat, i.e., Daniel.

Here, Jean's account of the April 4th incident demonstrated Daniel committed the misdemeanor offense of brandishing a shotgun in an angry and threatening manner (Pen. Code, § 417, subd. (a)) and, if the gun was loaded, the felony offense of assault with a firearm. (Pen. Code, § 245, subd. (a)(1); see *People v. Lucas* (1997) 55 Cal.App.4th 721, 732–735 [64 Cal.Rptr.2d 282] [shooting death foreseeable as a natural and probable consequence of either brandishing or assault with a deadly weapon].) This would alert a reasonably prudent landlord Daniel posed a risk of serious injury to other tenants and invitees. Chang's own evidence established he knew the threat remained particularly acute for Barber. According to Chang's separate statement, Jean King "did not express any concerns to Wei Chang about her safety, *just concern about Leroy Barber.*" (Italics added.) Chang's separate statement further described Barber as Gray's intended target: "As Chanda King allegedly attempted to go around the van to the driver's side door, Daniel Gray allegedly told Chanda King to 'Bring Leroy here. Bring him here' and 'Don't bother me.' "

 In any event, at his deposition, Chang himself recognized that Daniel represented "a threat, if it [Jean's letter] is true," and also testified he

"believed" Jean's account. We agree *with Chang* that a tenant who brandishes a gun while uttering threats in the manner described by Jean poses a foreseeable risk of harm to others. Consequently, Chang failed to meet his initial burden demonstrating he owed no duty, based on lack of notice, to take measures to reduce the risk of harm Daniel posed to others. (See *Ann M., supra*, 6 Cal.4th at p. 678 [foreseeability in the context of the existence of duty is a question of law].)

■ Chang also suggested in his moving papers that he owed no duty of care to Barber because Barber was not a foreseeable plaintiff. (See *Palsgraf v. Long Island R. R. Co.* (1928) 248 N.Y. 339, 343 [162 N.E. 99].) Specifically, Chang noted Barber "rarely came over to the apartment[s]" and, accordingly, Chang claimed he owed no duty to take protective steps "in the off chance that Barber m[ight] come onto the premises." But Chang acknowledged in his separate statement Barber had visited the apartments periodically. Given that Chang knew Barber had a "common law" stepson and mother-in-law living at the property, Barber's presence was reasonably foreseeable. Like any other visitor to the property, moreover, Barber was entitled to reasonable protection from harm on the premises. (See *Hardin v. Elvitsky* (1965) 232 Cal.App.2d 357, 368 [42 Cal.Rptr. 748] ["the visitor is the landlord's invitee, irrespective of whether the visit is for the visitor's or the tenant's business purpose, or whether the visitor comes as a mere social guest or other gratuitous licensee of the tenant"]; see also *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1015 [120 Cal.Rptr.2d 281] ["It is well settled that landowners owe a duty to tenants and invitees"].)

Chang's summary judgment motion asserted Barber could not show the heightened foreseeability required to impose a duty to hire security guards. As described above, Chang's separate statement focused solely on demonstrating no facts supported imposition of this particular duty. But Chang failed to address whether his duty of maintenance as a landlord included measures less burdensome than hiring guards to deal with the foreseeable risk Daniel posed. As the Supreme Court in *Delgado* explained, the "sliding-scale balancing formula" for determining duty requires heightened foreseeability before imposing burdensome protective measures on landowners, "but a minimal burden may be imposed upon a showing of a lesser degree of foreseeability." (*Delgado, supra*, 36 Cal.4th at p. 243.)

■ Barber's complaint alleged Chang owed him "a duty to take reasonable action to protect plaintiff from harm." Thus, Barber based his pleaded theory of recovery on the general duty of a landowner to protect tenants and invitees from the risk of harm posed by a potentially violent tenant. This allegation is broader than a specific duty to hire security guards, and covers "minimally burdensome measures" reasonable under the circumstances

(*Delgado, supra,* 36 Cal.4th at p. 245), which may include investigating the incident to determine whether to evict the potentially violent tenant, threatening to evict the tenant, or invoking the aid of police on a credible report of a brandishing crime committed by one tenant against another. (See *Ann M., supra,* 6 Cal.4th at p. 679 ["landowner's duty includes the duty to exercise reasonable care to discover that criminal acts are being or are likely to be committed on [his] land"]; *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1847 [41 Cal.Rptr.2d 192] [threat of eviction or eviction itself a "lever of control" which landlord could use to protect others on the property]; *Delgado, supra,* 36 Cal.4th at p. 241 [noting 911 call as protective option]; see also *Madhani, supra,* 106 Cal.App.4th at p. 418 [threat of eviction or lesser, incrementally protective measures such as a security camera may inhibit problem tenant]; *Rosales v. Stewart* (1980) 113 Cal.App.3d 130, 135 [169 Cal.Rptr. 660] [landlord's persuasion or threats may dissuade tenant].)

Our Supreme Court has observed that "placing a 911 call is a well recognized and generally minimally burdensome method of seeking assistance." (*Morris v. De La Torre* (2005) 36 Cal.4th 260, 277 [30 Cal.Rptr.3d 173, 113 P.3d 1182] (*Morris*).) In *Morris*, a gang member who had seized a knife from a restaurant kitchen stabbed a patron in the parking lot while three restaurant employees looked on without summoning aid. The Supreme Court recognized "there may be situations in which the response that is 'appropriate and reasonable under the circumstances' includes *not* making such a call—when doing so unreasonably would increase the danger to a patron, invitee, employee, or anyone else legally upon the premises . . . ." (*Ibid.*) On the record presented, however, the court could not "conclude as a matter of law that defendant's employees acted reasonably in declining to place a 911 call or undertake any other minimally burdensome measure on plaintiff's behalf. That disputed issue must be resolved by a jury in connection with its determination of whether defendant breached his duty to plaintiff." (*Id.* at p. 278.)

Here, we conclude the facts Chang alleged in moving for summary judgment failed to establish that simple protective measures such as calling the police after Daniel's brandishing attack were unreasonable or too burdensome as a matter of law. Chang suggested *Jean* should have placed the call, but attempting to shift onto another the onus of acting does not absolve a landlord of the duty to take simple preventative measures in the face of foreseeable harm. At most, invoking actions others might have undertaken merely suggests additional factors may have contributed to the shooting and Barber's resulting injuries. But Chang failed to identify causation as a ground for summary judgment in his initial motion. In any event, causation and whether the landlord's conduct is "reasonable under the circumstances—that is, whether there was a breach of the defendant's duty of care," are generally questions of fact for a jury. (*Nola M. v. University of Southern California*

(1993) 16 Cal.App.4th 421, 426–427 [20 Cal.Rptr.2d 97].) Thus, while we have determined Chang failed in his moving papers to establish as a matter of law that simple protective measures were beyond the scope of his duty, it remains for future determination whether—considering the circumstances as a whole—Chang responded reasonably to notice of the danger his tenant posed. And even "[i]f the jury determines there was a breach, there still remains the question whether that breach was the cause of the plaintiff's injuries." (Ibid.; see Vasquez, supra, 118 Cal.App.4th at p. 278.)

In sum, Chang's failure to address measures less burdensome than hiring security guards did not refute Barber's broadly pleaded theory of recovery.[2] Chang therefore failed to carry his initial burden. (See, e.g., Hawkins v. Wilton, supra, 144 Cal.App.4th at p. 945 ["because the motion did not negate theories of employer liability, the trial court should have held that [defendant] failed to carry his initial burden and stopped there"].) Consequently, Chang's failure to deal with this aspect of duty required denial of his summary judgment motion.

We emphasize that we do not decide the issue of security guards here. While Chang's contention that hiring security guards was too burdensome may prove to have merit at some subsequent point in these proceedings, he did not move for summary adjudication of that issue.[3] (Code Civ. Proc., § 437c, subd. (f)(1).) Accordingly, we may not consider relief he did not request. We therefore hold only that the April 4th brandishing incident rendered the danger Daniel posed foreseeable enough that undertaking one or more minimally burdensome measures was not—as a matter of law—beyond the scope of a landlord's duty of maintenance on the facts Chang presented. Because Chang failed to move for summary judgment on protective measures less burdensome than imposing security guards, and therefore failed to carry his initial burden to " 'conclusively negate[]' " the duty element of Barber's complaint, we must reverse. (Hawkins, supra, 144 Cal.App.4th at p. 940.)

For the benefit of the parties and the trial court on remand, we observe that the duty/foreseeability calculus is more complex with respect to security guards than for less burdensome measures. Whether a particular protective

---

[2] "[A] party may plead negligence . . . in general terms." (Singer v. Superior Court (1960) 54 Cal.2d 318, 323 [5 Cal.Rptr. 697, 353 P.2d 305].) If, in crafting his motion for summary judgment, Chang desired a more definite statement of the security measures Barber believed Chang neglected, interrogatories and other discovery mechanisms were at his disposal. (Id. at p. 324; see also Colvig v. RKO General, Inc. (1965) 232 Cal.App.2d 56, 75 [42 Cal.Rptr. 473] ["trial court may, in its discretion, require the clarification of the complaint"].)

[3] Chang sought summary adjudication only of Chanda's loss of consortium claim, based on the fact the couple were not married. The trial court summarily adjudicated the issue in Chang's favor, and Chanda filed no appeal.

measure falls within the scope of a landlord's duty of care or is precluded as a matter of law depends on a "sliding-scale balancing formula" that weighs foreseeability against the burden attending the measure. (*Delgado, supra*, 36 Cal.4th at p. 243.) Other factors may affect this determination. For example, *Ann M.* emphasized not only the social and financial costs of hiring security guards, but also the uncertainty whether this measure is an effective deterrent against third party crimes. (*Ann M., supra*, 6 Cal.4th at p. 679.) As the Supreme Court has observed, such considerations "may dictate against expanding the scope of a landowner's duty to include protecting against third party crime, even where there is sufficient evidence of foreseeability." (*Sharon P., supra*, 21 Cal.4th at pp. 1189–1190, fn. 2.)

Here, if properly presented with the issue, the trial court could consider the burden that hiring security guards would have on an individual owner of a small residential apartment unit, as opposed to larger commercial enterprises like the shopping center in *Ann M.*, and weigh also the net benefit in safety to an invitee who made sporadic appearances on the property. (See *Pamela W. v. Millsom* (1994) 25 Cal.App.4th 950, 958 [30 Cal.Rptr.2d 690] [what may be a minimal burden for the owner of a large apartment building or shopping center may create significant hardships for the owner of a four-unit project].) Issues unresolved by our opinion remain for the parties to address on remand as they choose.

## IV

## DISPOSITION

The summary judgment is reversed. Barber is entitled to his costs on appeal.

Fybel, J., concurred.

**RYLAARSDAM, J.,** Concurring.—I concur. But I write separately to note that it was because of the limited scope of the landlord's duty that was presented to the trial court that I agree to reverse the judgment. Not only the existence of a landlord's duty, but also the scope of that duty, is a question of law. "Foreseeability, when analyzed to determine the existence *or scope* of a duty, is a question of law to be decided by the court." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678 [25 Cal.Rptr.2d 137, 863 P.2d 207], italics added.)

In his motion for summary judgment defendant did not contradict that other measures he might have taken would also exceed the scope of his duty. He only asserted that he had no duty to provide guard service. I agree

that to impose a duty to provide 24-hour guard service at this four-unit apartment complex because of the brandishing incident would be unreasonably burdensome.

In *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th 666, the plaintiff, who worked in a shopping center, was raped inside her store. In the suit against the owner of the center, she claimed it negligently failed to provide security sufficient to prevent the rape. The court determined the owner did not have "reasonable cause to anticipate that criminal conduct such as rape would occur in the shopping center premises unless it provided security patrols in the common areas." (*Id.* at p. 676; see *id.* at p. 679.)

Here, the burden of hiring a round-the-clock security guard at a fourplex, in light of the one prior incident, is extreme. In *Ann M.* the court did not require a security guard for an entire shopping center. If a guard were needed, plaintiff could have had one to accompany him at far less expense than would be imposed on the landlord.

My colleagues suggest a precautionary act defendant could have taken to protect plaintiff was to call the police. Jean, the person allegedly witnessing the prior act, stated in her deposition that, although she was initially reluctant to do so, after the brandishing incident she did speak to the police. When she called and explained what happened she was told "it would be [her] word against his." Although she expected the police "would at least investigate the fact that [Daniel] had a gun," to her knowledge nothing was ever done.

Under these circumstances, would a second call from the landlord, who could not claim to have witnessed the incident, be more likely to result in police action? And, if not, how can we say that the breach of the landlord's duty to call the police contributed to the shooting incident that injured plaintiff?

My colleagues also refer indirectly to the possibility that defendant might have evicted Daniel. But does a landlord have a legal duty to evict a tenant where the police fail to take action after a purported witness reports the incident to them? What liabilities might a landlord have incurred had the report proved to be false? Is it unreasonable for a landlord to require a police report or a restraining order to begin eviction proceedings after he learns of an incident such as the brandishing that allegedly occurred here?

These are issues that were not litigated in the trial court. In concurring in the reversal of the summary judgment, I do not intend that the opinion should be read so as to preclude the court from considering such matters.